**IN THE UNITED STATES DISTRICT COURT**
**FOR THE**
**MIDDLE DISTRICT OF ALABAMA**

**SALZGITTER MANNESMANN (USA), INC.,**

**Plaintiff,**

**v.**

**SOUTHEASTERN STUD AND COMPONENT, INC.,**

**Defendant.**

**Case Number 07-764-MHT**

**RESPONSE TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

The Plaintiff, Salzgitter Mannesmann (USA), Inc. ("Salzgitter"), by a motion dated , April 4, 2008, has moved this Honorable Court for summary judgment, Fed R. Civ. P. 56 on its claims against the Defendant, Southeastern Stud and Component, Inc. ("Southeastern"), alleging there is not genuine issue of material fact. By this response, Southeastern advances its objection to granting summary judgment to the Plaintiff, and in support thereof, says as follows:

## I. Summary Judgment

### 1. The Moving Party

Initially, the burden is on the party seeking summary judgment. It is the moving party's job to inform the court of the basis for the motion, and identify those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553. Simply stated, the moving party must show the court that there is an

absence of evidence to substantiate the non-moving party's case. Id. at 325, 106 S.Ct. at 2553-54. To that end, the movant discharges its burden by asserting that the record does not contain a triable issue and identifying that part of the record which supports the moving party's assertion. *See* *Id*. at 323, 106 S.Ct. at 2552-53; *City of Mt. Pleasant, Iowa v. Associated Electric Cooperative*, 838 F.2d 268, 273 (8th Cir.1988).

**2. The Non-moving Party**

Once the movant has made its showing, the burden of production shifts to the non-moving party. The non-moving party must "go beyond the pleadings and by [its] ... own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' " establish that there is specific and genuine issues of material fact warranting a trial. *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553 (quoting Fed.R.Civ.P. 56(c)). The non-moving party cannot cast some metaphysical doubt on the moving party's assertion. *Matsushita Elec. Indust. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1355-56, 89 L.Ed.2d 538 (1986). The non-moving party must present specific significant probative evidence supporting its case, *Johnson v. Enron Corp.*, 906 F.2d 1234, 1237 (8th Cir.1990) sufficient enough "to require a ... judge to resolve the parties' differing versions of the truth at trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) (quoting *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 288-89, 88 S.Ct. 1575, 1592-93, 20 L.Ed.2d 569 (1968)). Any affidavits must "be made on *personal* knowledge, must set forth such facts as would be admissible in evidence, and shall affirmatively show that the affiant is competent to testify to the matters stated therein." Fed.R.Civ.P. 56(e) (emphasis added). If, however, the evidence tendered is "merely colorable," or is "not significantly probative," the non-moving

party has not carried its burden and the court must grant summary judgment to the moving party. *Id*. at 249-50,106 S.Ct. at 2511.

**II. Undisputed Facts**

1. Southeastern Stud & Components, Inc., is a manufacturer and assembler of steel components used in construction. The facilities of Southeastern Stud & Components, Inc., are located off the Selma Highway (Hwy 80) in an industrial park, across the street from the Big Lots warehouse.

2. Salzgitter distributes steel and its principal place of business is in Houston, Texas. The steel is manufactured by third-party steel mills.

3. In 2003, the parties entered into a series of contracts to supply Southeastern steel coil for a job in New Orleans, Louisiana.

4. From December 2005 until July 2006, Southeastern made five separate purchases from Salzgitter, as represented by purchase orders numbered: 120905-1, 012306-1, 1357, 1414, and 1496.

5. The steel from these purchase orders was intended for production of steel framing studs and ultimate use in commercial construction contracts.

6. The five Salzgitter orders noted above were originally requested for delivery and specific sequencing, on average, 6-8 weeks apart.

7. The quantity and dollar value of each order was specifically planned to be approximately the same so that each order would be paid for and processed by Southeastern by the time the next order arrived.

8. Southeastern paid for delivery by drawing against a one million dollar line of credit ($1,000,000.00). Sequencing of delivery allowed Southeastern to keep the running balance on this line of credit below $1,000,000.00.

9. Further, the sequenced timing of the deliveries would insure a smooth production flow and provide proper timing to the end users.

10. Under purchase order 120905-1, placed December 9, 2005, Southeastern ordered 1,983,000 pounds of steel, with a requested delivery date of April 1, 2—6. The steel was delivered 31 days late, May 2, 2006.

11. Under purchase order 012306-1, placed January 23, 2006, Southeastern ordered 1,874,000 pounds of steel, with a requested delivery date of May 1, 2006. Of the total order, 555,000 pounds of the steel was delivered 92 days late, August 1, 2006; 929,000 pounds of steel was delivered 143 days late, September 21, 2006, and the remaining 373,000 was delivered 183 days late, October 31, 2006.

12. Under purchase order 1357, placed April 18, 2006, Southeastern ordered 1,874,000 pounds of steel, with a requested delivery date of July 31, 2006. The steel was delivered 49 days late, September 18, 2006.

13. Under purchase order 1414, placed May 11, 2006, Southeastern ordered 1,653,000 pounds of steel, with a requested delivery date of September 15, 2006. The steel, to include an additional 44,000 pounds, was delivered 5 days late, September 20, 2006.

14. Under purchase order 1496, placed July 13, 2006, Southeastern ordered 1,764,000 pounds of steel, with a requested delivery date of November 15, 2006. The steel was delivered 32 days early, October 14, 2006.

15. Salzgitter performed all aspects of the contract except the expected delivery date.

16. The net result was that in a space of less than 90 days Salzgitter delivered, to the port of New Orleans, approximately $2,500,000.00 of product on an allowed line of credit of approximately $1,000.00.00.

17. Moreover, the referenced shipments came at a time when the building market had virtually collapsed and orders and shipments were significantly reduced to customers or end users by Southeastern.

**III. Argument and Authorities**

The *Texas Business and Commerce Code* § 2.612 (2003) (herein" *Tex. Bus. & Com. Code")*, provides a definition of an "installment contract" as a contract which "requires or authorizes the delivery of goods in separate lots to be separately accepted, even though the contract contains a clause 'each delivery is a separate contract' or its equivalent". A buyer may reject any installment which is non-conforming if "the non-conformity substantially impairs the value of that installment and cannot be cured", id. Whenever there is a non-conformity identified or a default with respect to one or more of the installments that substantially impairs the value of the whole contract then it is considered a breach of the whole, id. at (c).

Further, under the *Tex. Bus. & Com. Code* § 2.601, a buyer may, if the goods or the tender of delivery fail in any respect to conform to the contract:

(1) reject the whole; or

(2) accept the whole; or

(3) accept any commercial unit or units and reject the rest.

In circumstances where a seller fails or refuses to make delivery, and this is with respect to the whole if the breach goes to the whole contract (per § 2.612), the buyer has the option to cancel the contract and

a. "cover" and have damages under the next section as to all the goods affected whether or not they have been identified to the contract;

b. recover damages for non-delivery as provided in § 2.713.

In cases where a buyer wrongfully rejects or revokes acceptance of goods or fails to make a payment on or before delivery or repudiates with respect to a part or the whole, then any goods directly affected and, if the breach is of the whole contract (Section 2.612), then also with respect to the whole undelivered balance, the aggrieved seller may:

a. withhold delivery of such goods;

b. stop delivery by any bailee as hereafter provided (Section 2.705);

c. proceed under the next section respecting goods still unidentified to the contract; or

d. resell and recover damages as hereafter provided (Section 2.706);

e. recover damages for non-acceptance (Section 2.708) or in a proper case the price (Section 2.709);

f. cancel.

*Tex. Bus. & Com. Code* § § 2.703

A seller may resell the goods, *Tex. Bus. & Com.* Code § 2.706, concerned or the undelivered balance thereof. In a resale made in good faith and in a commercially reasonable manner, seller may recover the difference between the resale price and the contract price together with any incidental damages allowed under the provisions of the Texas UCC (§ 2.710), but less expenses saved in consequence of the buyer's breach.

In a private sale, the seller must give the buyer reasonable notification of his intention to resell, *Tex. Bus. & Com.* Code § 2.706. Where the resale is at public sale (1)

only identified goods can be sold (except where there is a recognized market for a public sale of futures in goods of the kind). The sale must be made at a usual place or market for public sale if one is reasonably available and except in the case of goods which are perishable or threaten to decline in value speedily the seller must give the buyer reasonable notice of the time and place of the resale; *Tex. Bus. & Com.* Code § 2.706.

This series of contracts were installment contracts within the definition of the Texas Business and Commercial Code. The failure of Salzgitter to deliver the raw steel as promised created a breach of the individual contracts and a breach of the overall contract.

The shortage in the flow of materials required Southeastern, pursuant to its rights under the commercial code to seek to cover their shortages on the open market and purchase alternative steel. However, these purchases, due to inflation in the price of steel were at a significantly inflated price.

Later, Salzgitter's failure to "space out" the sequencing of delivery of the steel, created a backlog in the production process, produced an over inventory at the Southeastern production facility, and required Southeastern to accept steel worth approximately $2,500,000.00 against a line of credit line capped at $1,000,000.00.

It is believed that Salzgitter attempted to resell or "cover" the steel that Southeastern failed to pick up at the port of New Orleans; however, Salzgitter has failed or refused to give notice or otherwise comply with the uniform commercial code in the resale or cover that was attempted subsequently.

If the first 3 orders had been not been delivered late, Southeastern would not have been appreciably impacted by the on time arrival of the 4th order.

At that point, the early arrival of the 5th order was a crucial factor to deal with and it further exacerbated the steel supply situation.

Salzgitter breached the installment contracts with Southeastern and the timing, costs to cover, and overall disruption in business damaged Southeastern.

The purchase orders advanced by Salzgitter and used to support the claim or claims against Southeastern bare the following numbered provision:

> 23. ARBITRATION: Any controversy or claims arising out of said contract, or the breach thereof, shall be determined by arbitration in Houston, Harris County, Texas in accordance with the Commercial Arbitration Rules of the American Arbitration Association, and judgment upon the award rendered by the Arbitrators(s) my be entered in any Court having jurisdiction thereof.

Salzgitter's claims against Southeastern are clearly encompassed by the arbitration agreement referenced above. Consequently, Salzgitter should be required to arbitrate their third-party claims against Southeastern. Salzgitter is in breach of this term or condition. A separate motion has been filed, April 23, 2008, asking for an order requiring Salzgitter to abide by this contract term.

**CONCLUSION**

Southeastern admits that it may owe Salzgitter for steel delivered and used in the manufacturing process. However, this amount should be offset by the costs to Southeastern for damages due to its attempt to cover Salzgitter's failure to make a timely delivery and should also be reduced by Salzgitter's sale of its steel in a sale. It is further alleged that Southeastern was damaged by Salzgitter's breach of the purchase order.

Southeastern requests this Honorable Court deny Salzgitter's motion for summary judgment. This response is supported by the affidavit Kennon W. Whaley, the sole shareholder, President, and Chief Executive Officer of Southeastern Stud & Components, Inc.

Memory & Day

By: /S/ James L. Day
James L. Day
ASB-1256-A55J

Von G. Memory
ASB-8137-071V

Attorneys for Defendant

OF COUNSEL

Memory & Day
Post Office Box 4054
Montgomery, Alabama 36103-4054
Tel (334) 834-8000
Fax (334) 834-8001
Email vgmemory@memorylegal.com
jlday@memorylegal.com

**CERTIFICATE OF SERVICE**

I hereby certify that I have this date served a copy of the foregoing document on the following, by:

☑ placing same in the United States Mail, postage prepaid, and properly addressed

☐ facsimile

☐ hand delivery

☐ delivered in open court

on April 25, 2008.

J. Forrest Hinton Jr., Esq.
Baker, Donelson, Bearman, Caldwell & Berkowitz
420 20th St N Ste 1600
Birmingham, AL 35203-5202

/S/ James L. Day
James L. Day

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE**
**MIDDLE DISTRICT OF ALABAMA**

**SALZGITTER MANNESMANN (USA), INC.,**

**Plaintiff,**

**v.**

**SOUTHEASTERN STUD AND COMPONENT, INC.,**

**Defendant.**

**Case Number 2:07cv764-MHT**

**AFFIDAVIT OF KENNON W. WHALEY**

**STATE OF ALABAMA**

**COUNTY OF MONTGOMERY**

I, Kennon W. Whaley, being duly sworn and placed under oath, deposes and says as follows:

1. I am a resident of Lee County, Alabama and I am the sole shareholder, President, and Chief Executive Officer of Southeastern Stud & Components, Inc. ("Southeastern")

2. By my legal counsel, I am providing this affidavit in support of a response to a motion for summary judgment prepared by and filed by my counsel of record, Von G. Memory.

3. Southeastern is the manufacturer and assembler of steel components used in construction.

4. The facilities of Southeastern are located off the Selma Highway (Hwy 80) in an industrial park, across the street from the Big Lots warehouse.

5. In 2003, Southeastern entered into a series of contracts with Salzgitter Mannesmann (USA), Inc. ("Salzgitter") to supply steel coil to Southeastern.

6. From December 2005 until July 2006, Southeastern made five separate purchases from Salzgitter, as represented by purchase orders numbered: 120905-1, 012306-1, 1357, 1414, and 1496.

7. The steel from these purchase orders was intended for production of steel framing studs and ultimate use in commercial construction contracts.

8. The five Salzgitter orders noted above were originally requested for delivery and specific sequencing, on average 6-8 weeks apart.

9. The quantity and dollar value of each order was specifically planned to be approximately the same so that each order would be paid for and processed by Southeastern by the time the next order arrived.

10. Southeastern paid for delivery by drawing against a one million dollar line of credit ($1,000,000.00) with Salzgitter. Sequencing of delivery allowed Southeastern to keep the running balance on this line of credit below $1,000,000.00.

11. Further, the sequenced timing of the deliveries would help Southeastern to insure a smooth production flow and provide proper timing to its end users.

12. If Salzgitters orders had been delivered to Southeastern as per our original purchase order request dates, the problems with the steel stud market collapse, over inventory, tight money supply, reduced Salzgitter credit limits, and substantial raw steel price reductions would not have been factors.

13. The trouble began with purchase order 120905-1 which Southeastern ordered for April 1, 2006 delivery. This order did not arrive until May 2, 2006.

14. Things really started to get out of shape when purchase order 012306-1 was requested for May 1, 06 delivery and it was delivered to Southeastern, in part, on August 1, 2006, on September 21, 2006, and the final balance was not delivered until October 31, 2006.

15. During the time in which we were waiting for the Salzgitter orders to arrive, we

were forced to go out on the open market and purchase alternative steel at inflated prices.

16. The difficulty and supply glut only got worse when order 1357, which was requested for July 31, 2006 delivery, did not arrive until September 18, 2006.

17. Purchase order 1414, which was requested for September 15, 2006 delivery, was then unfortunately delivered on time, September 20, 2006.

18. To make things absolutely unmanageable, purchase order 1496, which was requested for November 15, 2006 delivery, arrived early, October 15, 2006.

19. I am attaching a spreadsheet that details the Salzgitter delivery performance, which includes the dates requested, delivery dates, and pounds of steel delivered as **Exhibit "A"**.

20. The quantity and dollar value of each order was approximately the same so that each order would be paid for and processed by Southeastern by the time the next order arrived.

21. If the first 3 orders had been not been delivered to Southeastern late, we would not have been appreciably impacted by the on time arrival of the 4th order.

22. The early arrival of the 5th order would have been a factor to deal with, but I believe that with a slight payment concession on the part of Salzgitter, Southeastern would have managed the early arrival without significant problems.

23. It is believed that approximately $500,000.00 of steel product was not received by Southeastern. Subsequently, I was told that this product was sold to other individuals or entities. It is impossible to tell, in the current litigation, what impact occurred or what claim is being made for the steel product that was not accepted for Southeastern.

24. Although this affidavit was prepared by Memory & Day in response to the motion for summary judgment filed in this case, it was nevertheless reviewed by me, after providing the information to Memory & Day, and signed before a notary public after my review.

Dated, April 25, 2008.

Southeastern Stud & Components, Inc.

By: ______________________

Its: President

**STATE OF ALABAMA**

**COUNTY OF MONTGOMERY**

I, the undersigned, a Notary Public in and for County in said State, hereby certify that **Kennon W. Whaley** whose name as President of Southeastern Stud & Components, Inc., a corporation, is signed to the foregoing document and who is known to me, acknowledged before me on this day that, being informed of the contents of the document, she/he, as such officer and with full authority, executed the same voluntarily for and as the act of said corporation.

GIVEN under my hand this 24th day of April 2008.

______________________
Notary Public

(SEAL)

My commission expires: NOTARY PUBLIC STATE OF ALABAMA AT LARGE
MY COMMISSION EXPIRES: Sept 22, 2010
BONDED THRU NOTARY PUBLIC UNDERWRITERS

THIS INSTRUMENT WAS PREPARED BY:

Memory & Day
P.O. Box 4054
Montgomery, AL 36013
Tel (334) 834-8000
Fax (334) 834-8001
vgmemory@memorylegal.com
jlday@memorylegal.com

**EXHIBIT A**

**SALZGITTER DELIVERY PERFORMANCE SUMMARY**

| | ITEMS ORDERED | POUNDS ORDERED | PRICE | P.O. VALUE | P.O. Original Reguest Date | POUNDS DELIVERED | DELIVERY DATE | POUNDS DELIVERED | DELIVERY DATE | POUNDS DELIVERED | DELIVERY DATE |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **P.O. 120905-1** | 0.017 | 661000 | 0.3195 | $ 211,189.50 | 4/1/2006 | 640000 | 5/2/2006 | | | | |
| Date 12/9/05 | 0.027 | 661000 | 0.3095 | $ 204,579.50 | 4/1/2006 | 630000 | 5/2/2006 | | | | |
| | 0.0435 | 661000 | 0.3095 | $ 204,579.50 | 4/1/2006 | 663000 | 5/2/2006 | | | | |
| | | **1983000** | | $ 620,348.50 | | **1933000** | | | | | |
| | | | | | | M/V IDC1V095E | | | | | |
| **P.O. 012306-1** | 0.016 | 441000 | 0.3345 | $ 147,514.50 | 5/1/06 | 209000 | 8/1/2006 | 145000 | 9/21/06 | 86000 | 10/31/06 |
| Date 1/23/06 | 0.0265 | 441000 | 0.3195 | $ 140,899.50 | 5/1/06 | 234000 | 8/1/2006 | 0 | | 207000 | 10/31/06 |
| Alt P.O. 1033 | 0.0435 | 441000 | 0.3165 | $ 139,576.50 | 5/1/06 | 112000 | 8/1/2006 | 281000 | 9/21/06 | 40000 | 10/31/06 |
| | 0.054 | 551000 | 0.3190 | $ 175,769.00 | 5/1/06 | 0 | | 503000 | 9/21/06 | 40000 | 10/31/06 |
| | | **1874000** | | $ 603,759.50 | | **555000** | | **929000** | | **373000** | |
| | | | | | | M/V Furia | | M/V African Hawk | | ukn vessel | |
| **P.O. 1357** | 0.0275 | 882000 | 0.3765 | $ 332,073.00 | 7/31/06 | 897000 | 9/18/06 | | | | |
| Date 4/18/06 | 0.0433 | 992000 | 0.3655 | $ 362,576.00 | 7/31/06 | 950000 | 9/18/06 | | | | |
| | | **1874000** | | $ 694,649.00 | | **1847000** | | | | | |
| | | | | | | M/V Akili | | | | | |
| **P.O. 1414** | 0.0165 | 661000 | 0.4465 | $ 295,136.50 | 9/15/06 | 682000 | 9/20/2006 | | | | |
| Date 5/11/06 | 0.027 | 551000 | 0.4255 | $ 234,450.50 | 9/15/06 | 562000 | 9/20/2006 | | | | |
| | 0.0435 | 441000 | 0.4190 | $ 184,779.00 | 9/15/06 | 433000 | 9/20/2006 | | | | |
| | | **1653000** | | $ 714,366.00 | | **1677000** | | | | | |
| | | | | | | M/V Myron N | | | | | |
| **P.O. 1496** | 0.0165 | 551000 | 0.4290 | $ 236,379.00 | 11/15/06 | 551000 | 10/14/06 | | | | |
| Date 7/13/06 | 0.027 | 772000 | 0.4080 | $ 314,976.00 | 11/15/06 | 772000 | 10/14/06 | | | | |
| | 0.0435 | 441000 | 0.4010 | $ 176,841.00 | 11/15/06 | 441000 | 10/14/06 | | | | |
| | | **1764000** | | $ 728,196.00 | | **1764000** | | | | | |
| | | | | | | M/V Top Rich | | | | | |

**2/29/06**