IN THE UNITED STATES DISTRICT COURT
FOR THE
MIDDLE DISTRICT OF ALABAMA

**SALZGITTER MANNESMANN (U.S.A.), INC.,**

           Plaintiff,

v.

**SOUTHEASTERN STUD and COMPONENT, INC.,**

           Defendant.

Case Number 07-764-MHT

**BRIEF OF DEFENDANT**

Defendant, Southeastern Stud & Components, Inc. ("Southeastern"), by a motion dated April 22, 2008, moved this Honorable Court to compel the Plaintiff, Salzgitter Mannesmann International (USA), Inc. ("Salzgitter") to arbitrate matters before the Court. The court has given leave to the parties to provide briefs on this matter no later than May 2, 2008. The Defendant submits the instant brief in support thereof.

**I. Facts**

1. Southeastern Stud & Components, Inc., is a manufacturer and assembler of steel components used in construction. The facilities of Southeastern Stud & Components, Inc., are located off the Selma Highway (Hwy 80) in an industrial park, across the street from the Big Lots warehouse.

2. Salzgitter distributes steel and its principal place of business is in Houston, Texas. The steel is manufactured by third-party steel mills.

3. In 2003, the parties entered into a series of contracts to supply Southeastern steel coil for a job in New Orleans, Louisiana.

4. From December 2005 until July 2006, Southeastern made five separate purchases from Salzgitter, as represented by purchase orders numbered: 120905-1, 012306-1, 1357, 1414, and 1496.

5. The steel from these purchase orders was intended for production of steel framing studs and ultimate use in commercial construction contracts.

6. The five Salzgitter orders noted above were originally requested for delivery and specific sequencing, on average, 6-8 weeks apart.

7. The quantity and dollar value of each order was specifically planned to be approximately the same so that each order would be paid for and processed by Southeastern by the time the next order arrived.

8. Southeastern paid for delivery by drawing against a one million dollar line of credit ($1,000,000.00). Sequencing of delivery allowed Southeastern to keep the running balance on this line of credit below $1,000,000.00.

9. Further, the sequenced timing of the deliveries would insure a smooth production flow and provide proper timing to the end users.

10. Under purchase order 120905-1, placed December 9, 2005, Southeastern ordered 1,983,000 pounds of steel, with a requested delivery date of April 1, 2—6. The steel was delivered 31 days late, May 2, 2006.

11. Under purchase order 012306-1, placed January 23, 2006, Southeastern ordered 1,874,000 pounds of steel, with a requested delivery date of May 1, 2006. Of the total order, 555,000 pounds of the steel was delivered 92 days late, August 1, 2006; 929,000 pounds of steel was delivered 143 days late, September 21, 2006, and the remaining 373,000 was delivered 183 days late, October 31, 2006.

12. Under purchase order 1357, placed April 18, 2006, Southeastern ordered 1,874,000 pounds of steel, with a requested delivery date of July 31, 2006. The steel was delivered 49 days late, September 18, 2006.

13. Under purchase order 1414, placed May 11, 2006, Southeastern ordered 1,653,000 pounds of steel, with a requested delivery date of September 15, 2006. The steel, to include an additional 44,000 pounds, was delivered 5 days late, September 20, 2006.

14. Under purchase order 1496, placed July 13, 2006, Southeastern ordered 1,764,000 pounds of steel, with a requested delivery date of November 15, 2006. The steel was delivered 32 days early, October 14, 2006.

15. Salzgitter performed all aspects of the contract except the expected delivery date.

16. The net result was that in a space of less than 90 days Salzgitter delivered, to the port of New Orleans, approximately $2,500,000.00 of product on an allowed line of credit of approximately $1,000.00.00.

Moreover, the referenced shipments came at a time when the building market had virtually collapsed and orders and shipments were significantly reduced to customers or end users by Southeastern.

## II. Arbitration

A written arbitration provision is enforceable under The Federal Arbitration Act ("FAA") in "a contract evidencing a transaction involving commerce", 9 U.S.C.A. § 2. The FAA defines commerce as "commerce among the several states," 9 U.S.C.A. § 1.

As a general matter of federal policy, "where the contract contains an arbitration clause, there is a presumption of arbitrability in the sense that '[a]n order to arbitrate a particular grievance should not be denied unless it may be said with positive assurance that the arbitration

clause is not susceptible of an interpretation that covers the asserted dispute,'" Stinson v. America's Home Place, Inc., 108 F.Supp.2d 1278, at 1281 (M.D.Ala.,2000) citing: AT& T Technologies, Inc. v. Communications Workers of America, 475 U.S. 643, 651, 106 S.Ct. 1415, 1419, 89 L.Ed.2d 648 (1986) (reviewing dispute arising under the Labor Management Relations Act); see also Ruby-Collins, Inc. v. City of Huntsville, Alabama, 748 F.2d 573, 576 (11th Cir.1984) ("[F]ederal policy requires that we construe arbitration clauses generously, resolving all doubts in favor of arbitration."); Seaboard Coast Line Railroad Co. v. Trailer Train Co., 690 F.2d 1343, 1348 (11th Cir.1982) (same).

Section 4 also provides that "upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue," a federal court should grant the petition, 9 U.S.C.A. § 4.

### III. Argument

As a threshold issue, the interstate commerce requirement is met because Southeast, an Alabama corporation, contracted with Salzgitter, a corporation with its principal place of business in Texas (it is believed, Salzgitter is a foreign corporation, not incorporated or registered to conduct commerce in the State of Alabama, pursuant to Ala. Code § 10-2B-15.02 (1996)), to supply steel coil for Southeast to use in the production of steel framing and studs in Alabama and throughout the southeast and also because the materials used by Southeast traveled in interstate commerce.

The purchase orders advanced by Salzgitter and used to support the claim or claims against Southeastern bare the following numbered provision:

> 23. ARBITRATION: **Any controversy or claims** arising out of said contract, or the breach thereof, shall be determined by arbitration in Houston, Harris County, Texas in accordance with the Commercial Arbitration Rules of the American Arbitration Association, and judgment

>upon the award rendered by the Arbitrators(s) my be entered in any Court having jurisdiction thereof. [**emphasis added**]

A copy of the Salzgitter purchase order is attached hereto as **Exhibit "A"**.

Salzgitter's claims against Southeastern are clearly encompassed by the arbitration provision in the contract referenced above. Moreover, the agreement, as drafted by Salzgitter, "is not susceptible of an interpretation that covers the asserted dispute", <u>Stinson</u>, at 1281, as the text of the agreement refers to <u>any</u> <u>controversy</u> <u>or</u> <u>any</u> <u>claim</u>.

Further, 9 U.S.C.A. §4, requires that "The hearing and proceedings, under such agreement, shall be within the district in which the petition for an order directing such arbitration is filed. If the making of the arbitration agreement or the failure, neglect, or refusal to perform the same be in issue, the court shall proceed summarily to the trial thereof".

Southeastern admits that it may owe Salzgitter for steel delivered and used in the manufacturing process. However, this amount should be offset by the costs to Southeastern for damages due to its attempt to cover Salzgitter's failure to make a timely delivery and should also be reduced by Salzgitter's sale of its steel in a sale. It is further alleged that Southeastern was damaged by Salzgitter's breach of the purchase order.

These matters could be effectively determined by arbitration and pursuant to 9 U.S.C.A. §4 should be heard in the Middle District of Alabama.

## CONCLUSION

Salzgitter's claims against Southeastern are clearly encompassed by the arbitration agreement referenced above. Southeastern respectfully requests that the Court order Salzgitter to arbitrate their third party claims against Southeastern.

Respectfully submitted on this the 2nd day of May 2008.

                                                Memory & Day

                                        By: /S/ James L. Day
                                                James L. Day
                                                ASB-1256-A55J

                                                Von G. Memory
                                                ASB-8137-071V

                                                Attorneys for Defendant

OF COUNSEL

Memory & Day
Post Office Box 4054
Montgomery, Alabama 36103-4054
Tel (334) 834-8000
Fax (334) 834-8001
Email  vgmemory@memorylegal.com
       jlday@memorylegal.com

**CERTIFICATE OF SERVICE**

I hereby certify that I have this date served a copy of the foregoing document on the following, by:

☒ placing same in the United States Mail, postage prepaid, and properly addressed

☐ facsimile

☐ hand delivery

☐ delivered in open court

on May 2, 2008.

J. Forrest Hinton Jr., Esq.
Baker, Donelson, Bearman, Caldwell & Berkowitz
420 20th St N Ste 1600
Birmingham, AL 35203-5202

Stacey A Davis, Esq.
Baker Donelson Bearman Caldwell & Berkowitz, PC

420 20th Street North
Wachovia Tower, Suite 1600
Birmingham, AL 35203

James Elliott Walthall, Esq.
Baker Donelson Bearman Caldwell & Berkowitz PC
420 20th Street North, Suite 1600
Wachovia Tower
Birmingham, AL 35203-5202

                                                  /S/ James L. Day
                                                  James L. Day

## TERMS AND CONDITIONS OF SALE

(These attached terms and conditions are an integral part of the contract and supersede any and all other terms and conditions that have been presented by Purchaser)

1. **TERMS PARAMOUNT**: The contract between Purchaser and Seller shall be solely as defined hereby together with all of the documents or attachments referenced herein except as it may be modified by changes hereto. In the event of any conflict between the terms of the contract as defined hereby and the terms of the Purchaser's purchase order, letter of credit or other document incidental to this contract, the terms set forth herein shall prevail. Any conditions or exceptions which may be stated in any communication or document received by Seller from Purchaser shall be of no effect unless specifically agreed to in writing by Seller. This Sales Confirmation constitutes notice of objection to any conditions in Purchaser's inquiry or purchase order or any other documents which are contrary or in addition to the conditions set forth herein.

2. **WARRANTY**: SELLER WARRANTS THAT ALL MATERIAL CONFORMS TO CONTRACT SPECIFICATIONS; THERE ARE NO WARRANTIES, EXPRESS OR IMPLIED, OF MERCHANTABILITY, FITNESS OR OTHERWISE, WHICH EXTEND BEYOND THE DESCRIPTION ON THE FACE OF THE CONTRACT.

3. **QUANTITY**: Unless otherwise specified, Seller may deliver and Purchaser will accept up to ten (10%) percent more or less than the contract quantity. Where material is sold on an actual weight basis, mill weights shall be conclusive.

4. **PARTIAL SHIPMENTS**: Unless otherwise specified, Seller shall have the right to make partial shipments. Each partial shipment shall be deemed a separate sale and payment shall become due therefore in accordance with the terms of payment.

5. **RISK OF LOSS**: Purchaser shall bear all risk of loss or damage to or destruction of the material covered hereby from after delivery at the point of delivery stipulated in the contract, unless otherwise expressly provided.

6. **IMPORT DUTY AND TAXES**: If the contract calls for Seller to pay duty on imported material, and only in such case, Seller shall pay the amount of United States import duty at the rates stated in the Tariff Schedules of the United States in effect on the date of the contract. If duty is determined by value, it shall be based upon Seller's cost. If the total amount of duties (regular and special), at any time, required to be paid is for any reason whatsoever greater (or less) than this amount, the difference shall be charged (or credited) to Purchaser. In the event that any new or increased U.S. Federal, State or local taxes, however denominated are imposed upon the imported material after the date of the contract, such new or increased taxes shall be for the account of and charged to Purchaser.

7. **Cost of Insurance and Transportation**: If the contract provides that Seller shall pay insurance and transportation costs, they shall be at the applicable rates in effect at the date of the contract. If for any reason the cost of insurance or transportation increases prior to the shipment date, such increases shall be for the account of and charged to Purchaser.

8. **DELAY IN OR NON-SHIPMENT**: If for any reason beyond the control of Seller or of Seller's supplier shipment is not made within the time specified:

    (a) Seller shall not be liable therefore and,
    (b) Unless otherwise agreed, the time for shipment shall be extended for a period of ninety (90) days, and Purchaser, if payment is to be made by letter of credit, shall extend such letter of credit for ninety (90) days. If shipment is not made within such extended ninety (90) day period, the contract shall be deemed to be cancelled by mutual consent and without liability to either party. In no event shall Seller be liable for consequential or special damages for delay in or non-shipment of any material under this contract.

9. **DEVIATION**: If after the material has been shipped, its arrival at the destination port is delayed or prevented; or the vessel is deviated to a different port for reasons beyond Seller's control, the Seller shall advise the Purchaser of any such delay and or deviation within a reasonable time and shall cooperate with the Purchaser to get the material to the Purchaser's original destination stipulated by the accepted contract, without prejudice or liability to the Seller.

10. **CLAIMS**: (a) Shortages — All claims for shortages in deliveries must be made promptly after receipt of the material by Purchaser. All claims for shortages must be supported by documentary evidence in the form of exceptions taken on delivery receipt (however denominated) furnished by Purchaser to the delivering carrier. Failure to take such exceptions at time of delivery shall constitute an absolute bar to any claim.

    (b) Damaged or Defective Material—All claims of damaged or defective material are barred unless reported in writing by Purchaser to Seller, with full particulars, promptly after the damage was or reasonably should have been discovered, and full facilities are offered Seller and its insurer for inspection and investigation.

    All claims must be made by registered or certified mail, or courier, must state with particularity the defect or damage complained of and must be supported by documentary evidence. In no event may any claim be made more than thirty (30) days after material is received by Purchaser or thirty (30) days after the defect or damage reasonably should have been discovered.

    In the event that a timely and bona fide claim is made with respect to damaged or defective material, Purchaser shall be entitled, at Seller's sole and exclusive option, to replacement of the material, refund of any purchase price paid therefore or an allowance. Seller shall not be otherwise liable for such damaged or defective material or its use or for consequential or special damages. Purchaser's obligation to accept and make payment on time for the balance of the material delivered or to be delivered under the contract shall not be affected thereby.

    In case of a dispute as to whether material meets contract specifications, Seller or Purchaser may designate a mutually acceptable independent testing company and/or surveyor to make an examination and in such case said testing Company's and/or surveyor's findings shall be conclusive and binding on both parties (the expense of which examination shall be borne by Seller with respect to each item found not to conform to specifications and by Purchaser with respect to each item found to conform to specifications). Seller shall not be responsible for inherent vice, such as atmospheric rust if steel is ordered without wrapping, and for internal sweating on wrapped steel. Seller shall not be deemed to have knowledge of the intended ultimate purchase or use of any of the material.

11. **SELLER'S REMEDIES**: In the event that Purchaser fails to perform its obligations, Seller, at its option, may cancel the contract and recover from Purchaser its damages, including its expenses, mill cancellation fees and the difference between the contract price and the lesser of Seller's cost or the market price at point of delivery, or Seller may dispose of the material publicly or privately from Purchaser's account and apply the net proceeds, after deducting expenses of disposition, against the purchase price. In the case of any deficiency, Purchaser shall remain liable therefore. Seller's expenses in either case shall include reasonable attorney's fees and other costs of enforcing its rights.

12. **PURCHASER'S REMEDIES**: Except as otherwise provided herein, failure of Seller to entitle Purchaser, at Seller's sole and exclusive option, to replacement of material shipped, refund of any purchase price paid therefore or an allowance. Seller shall not be liable for any consequential or special damages.

13. **INTEREST DUE ON LATE PAYMENT:** If payment is not made on time, Seller, in addition to its other legal rights, shall be entitled to interest at the highest rate allowed by law, or at a minimum, which shall equal prime as published in the Wall Street Journal, plus two (2%) percent.

14. **SUSPENSION OF FUTURE SHIPMENTS – CHANGE OF CREDIT TERMS:** Purchaser hereby represents that it is solvent and Purchaser's signing of any delivery receipt (however denominated) furnished by Purchaser to the delivering carrier shall constitute a further representation of solvency at the time of signing such receipt. Seller shall have the right to withhold shipment of any portion of the material covered by this contract or any other existing contract between Seller and Purchaser, in the event Purchaser fails to make payment when due under any contract between Purchaser and Seller. Said action on the part of Seller shall not release Purchaser from its obligation to accept and pay for such remaining portion of material if and when shipped by Seller, such remaining portion of material if and when shipped by Seller.

    If at any time there is a change in the financial conditions or structure of Purchaser, arising from a change in business or market conditions or otherwise, or arising from a merger, reorganization or other change in business form, or if Purchaser becomes insolvent, makes an assignment for the benefit of creditors, or a petition in bankruptcy with respect to Purchaser is filed, or if any lien, arising from judicial process or otherwise, is placed upon any material asset of Purchaser, or if Purchaser breaches any provisions hereof, then Seller shall have the right to cancel the contract, including but not limited to requiring the payment of cash in advance of delivery.

15. **SECURITY INTEREST:** Purchaser grants Seller a security interest in all property of Purchaser now or hereafter in Seller's possession or control and Seller may hold such property as security for payment of all obligations due to Seller and may dispose of such property at private sale to satisfy amounts owed to Seller by Purchaser.

16. **MODIFICATIONS:** The contract constitutes the entire agreement between the parties and no modification shall be effective unless agreed to in writing.

17. **NON-WAIVER OF TERMS:** failure of Seller to insist upon strict performance of any terms and conditions hereof shall not be deemed a waiver of any rights Seller may have. The shipping or receiving of any material shall not be deemed a waiver of any rights concerning a failure by Purchaser to comply with any provision hereof. Waiver by Seller of any provision hereof shall not constitute a waiver as to any other provision, and shall not affect the right of Seller to exercise thereafter any right or remedy in the event of any other default whether similar or not.

18. **REPRESENTATIONS:** Purchaser and Seller agree that no representations have been made or relied upon, except as specifically stated herein.

19. **ASSIGNMENT:** This contract may not be assigned without the written agreement of the parties.

20. **SEVERABILITY:** Any legally invalid provision hereof shall be considered severable.

21. **FORCE MAJEURE:** Seller shall be relieved from performance of its obligations, promises, covenants or warranties hereunder due to inability to perform in whole or in part as a result of force majeure, which shall include without limitation compliance with any law, ordinance, regulation, ruling order or other governmental action, judicial decree or treaty (including embargo, wage or price control, or rationing or allocation of services or commodities), or due to acts of God, fire, flood, war, sabotage, accidents, labor disputes, shortage or failure of supply of transportation, supply of materials or equipment, interruption of or delay in communications or transportation, or any other circumstances of like nature beyond the reasonable control of Seller.

22. **GOVERNING LAW:** The contract between Purchaser and Seller as defined by this Sales confirmation shall be governed by the laws of the State of Texas, United States of America.

23. **ARBITRATION:** Any controversy or claims arising out of said contract, or the breach thereof, shall be determined by arbitration in Houston, Harris County, Texas in accordance with the Commercial Arbitration Rules of the American Arbitration Association, and judgment upon the award rendered by the Arbitrator(s) may be entered in any Court having jurisdiction thereof.